S:\04cv0822dis.wpd

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **GREGORY LOTT,** | : | **Case  No.  1:04 CV 822** |
| | : | |
| Petitioner, | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **vs.** | : | |
| | : | |
| **MARGARET BAGLEY, Warden,** | : | <u>**MEMORANDUM OF OPINION**</u> |
| | : | <u>**& ORDER**</u> |
| Respondent. | : | |

Gregory Lott, (hereinafter "Lott" or "Petitioner"), has filed a successive petition in this

Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2244.  Lott challenges the

constitutional sufficiency of his conviction by a three-judge panel for aggravated capital murder,

and also challenges the constitutionality of the imposition of a sentence of death.

For the reasons set forth below, Lott's successive petition for a writ of habeas corpus is

**DISMISSED**.

## I.  PROCEDURAL HISTORY

Much of the lengthy procedural history occurred in this matter prior to Lott's first federal

habeas petition.  The Court quotes its previous Memorandum of Opinion and Order (Case No. 95

CV 2642, Doc. No. 109), for the procedural history that occurred prior to the filing of the first

petition (including the original footnotes contained therein -- renumbered to flow consecutively

in this order):

On July 15, 1986, John McGrath was found on his bedroom floor suffering

from burns on his chest, back, and legs. He died in the hospital on July 23, 1986. On August 8, 1986, in criminal case number 211002, Lott was indicted by the Cuyahoga County Grand Jury for the following crimes against John McGrath: (1) aggravated murder (with felony murder specification), in violation of Ohio Rev. Code §2903.01; (2) aggravated burglary, in violation of Ohio Rev. Code §2911.11; (3) aggravated robbery, in violation of Ohio Rev. Code §2911.01; (4) kidnaping, in violation of Ohio Rev. Code §2905.01; and (5) aggravated arson, in violation of Ohio Rev. Code §2909.02.  Lott was arraigned on August 12, 1986, and entered pleas of not guilty to all charges.

On September 5, 1986, in criminal case number 211261, Lott was separately indicted for two 1983 crimes against John McGrath: (1) aggravated burglary, in violation of Ohio Rev. Code §2911.11; and (2) petty theft, in violation of Ohio Rev. Code §2913.02. Lott was arraigned on September 22, 1986, and entered  pleas of not guilty to both charges.

On October 17, 1986, in case number 212720, Lott was indicted for one count of aggravated arson, in violation of Ohio Rev. Code §2909.02.  This was a reindictment of the aggravated arson count charged in case number 211002, which had been indicted incorrectly.  Lott was arraigned on October 17, 1986, and entered a plea of not guilty to the charge.

At a July 23, 1987 pre-trial conference, Lott signed a written waiver of his right to a jury trial, and consented to be tried by a three judge panel, as provided in Ohio Rev. Code §2945.06.  In a colloquy with the Judge, Lott also verbally

2

indicated his desire to waive his right to a jury trial.  At the request of the

prosecutor and without objection from the defense, the Court also joined the

charges in the three separate cases so that all charges could be tried together.  The

Court also severed all charges which did not relate to John McGrath.

A three judge panel was selected pursuant to the procedures outlined in

Ohio Rev. Code §§2929.03 and 2929.04.  The panel was comprised of Judges

James McGrath,[1] James McMonagle, and James Kilcoyne.

On July 13, 1987, the trial began. The state rested three days later, on July

16, 1987.  Pursuant to a Rule 29 Motion for Judgment of Acquittal, the kidnaping

charge was dismissed.  On July 17, 1987, the panel unanimously found Lott guilty

of aggravated murder.  The panel also found Lott guilty of the felony murder and

aggravated felony specifications.  Lott was found guilty of the lesser charges as

well.

On July 27, 1987, the mitigation phase got underway, and both the state

and Lott presented evidence.  On July 29, 1987, the three judge panel

unanimously found that the aggravating circumstances outweighed the mitigating

factors, and sentenced Lott to death for the aggravated murder of John McGrath.

He was sentenced on the remaining counts shortly thereafter.

Lott timely appealed his convictions and also the imposition upon him of

the death penalty.  The Court of Appeals affirmed his conviction, as did the Ohio

Supreme Court.  State v. Lott, 1989 WL 24927 (Ohio Ct. App. March 16, 1989);

---

[1]        Judge McGrath is no relation to the victim, John McGrath.

3

State v. Lott, 555 N.E.2d 293 (Ohio 1990). Lott filed a motion for rehearing by the Ohio Supreme Court on June 19, 1990, which was denied on July 25, 1990.  The United States Supreme Court denied Lott's petition for a writ of certiorari, over Justice Marshall's dissent, on December 10, 1990.  Lott v. Ohio, 498 U.S. 1017 (1990).[2]

Lott then petitioned for post-conviction relief in state court, pursuant to Ohio Rev. Code §2953.21.[3] In his initial petition, Lott raised fifty-five (55) claims for relief. The state filed a motion to dismiss Lott's petition.  The Court of Common Pleas granted the state's motion and dismissed Lott's petition on September 28, 1993. State v. Lott, Nos.  211002, 211261, 212720 (Cuy. Ct. Common Pleas Sept. 28, 1993).  Lott appealed.   The Court of Appeals affirmed the lower court's dismissal of Lott's petition on November 3, 1994. State v. Lott, 1994 WL 615012 (Ohio Ct. App. Nov. 3, 1994). Lott appealed to the Ohio Supreme Court, which declined to exercise jurisdiction. State v. Lott, No. 94-2577 (Ohio March 15, 1995).

Lott also applied for delayed reconsideration in the Court of Appeals, pursuant to State v. Murnahan, 584 N.E.2d 1204 (Ohio 1992), asserting ineffective assistance of appellate counsel.  The Court of Appeals denied this

---

[2]    Lott was represented at trial by attorneys Elmer Giuliani and James Kersey.  Lott was represented during his direct state court appeals by attorneys David Doughten and Patricia Walsh.

[3]    Lott was represented throughout his state post-conviction proceedings by Dale Baich, of the Ohio Public Defender Commission.

4

motion. State v. Lott, No. 54537 (Cuyahoga Ct. of Common Pleas April 15,

1992).  Lott appealed the denial of his motion for delayed reconsideration to the

Ohio Supreme Court.  The Ohio Supreme Court affirmed without opinion.  State

v. Lott, 638 N.E.2d 1039 (Ohio 1994).

On December 14, 1995, Lott filed in this Court a notice of intent to file a

petition for a writ of habeas corpus.  Lott filed his petition on February 3, 1997.

Id. at 2-5.

While Lott's habeas litigation was pending in federal court, Lott returned to state court,

filing a first successor petition for post-conviction relief, alleging, inter alia, that the State had

withheld exculpatory evidence regarding the victim's identification of him.  On May 9, 2001, the

trial court denied Lott's petition.  (Doc. No. 10, Exh. 75).

Lott appealed the decision.  The Eighth District Court of Appeals affirmed the trial court

on May 30, 2002.  State v. Lott, Nos. 79790, 79791, 79792, 2002 WL 1265579 (Ohio Ct. App.

May 30, 2002).  Lott filed a memorandum in support of jurisdiction with the Ohio Supreme

Court on June 19, 2003.  That court declined to accept jurisdiction.  State v. Lott, 773 N.E.2d 552

(Ohio 2002).

In June, 2002, the United States Supreme Court issued its opinion in Atkins v. Virginia,

536 U.S. 304 (2002), holding that the Eighth Amendment prohibits the execution of one who is

mentally retarded.  Thereafter, Lott filed a motion with the Ohio Supreme Court to vacate his

sentence, asserting that he was mentally retarded and ineligible for the death penalty pursuant to

the Atkins holding.  On August 14, 2002, the Ohio Supreme Court granted Lott's motion for a

stay of execution to permit him to pursue this claim in a second successor post-conviction

5

petition.  State v. Lott, 773 N.E.2d 551 (Table) (Ohio 2002).  The Ohio Supreme Court thereafter remanded the case to the trial court, providing that court with instructions under which it must proceed.  State v. Lott, 779 N.E.2d 1011 (Ohio 2002).

Lott filed a second successor post-conviction petition on July 17, 2002.  Two experts, selected by Lott, testified during a hearing that Lott was not mentally retarded.  Thereafter, the State moved for summary judgment, which Lott did not oppose.  On October 14, 2003, the trial court granted the State's motion for summary judgment.  (Doc. No. 11, Exh. 89).  Lott initially attempted to appeal this decision on November 14, 2003, but Lott's notice of appeal was untimely and he failed to file the trial court record.  The Eighth District Court of Appeals dismissed the appeal on January 16, 2004.  (Doc. No. 11, Exh. 90).

On August 9, 2002, Lott submitted a clemency application to the Ohio Parole Board, asserting, inter alia, that he was actually innocent.  The Ohio Parole Board held a hearing on this issue on August 13, 2002.  Three days later, the Parole Board recommended that the Governor deny Lott clemency.  (Doc. No. 11, Exh. 94).

On April 13, 2004, Lott filed a motion for a new trial in state court, asserting that he was actually innocent of the murder.  Lott requested and received permission to place that motion in abeyance pending the resolution of the instant proceedings.

## II. FACTUAL HISTORY

The Court quotes its previous Memorandum of Opinion and Order (Case No. 95 CV 2642, Doc. No. 109), for the factual history surrounding the murder:

> The factual background of this case was properly set forth by the Ohio
> 
> Supreme Court in State v. Lott, 555 N.E.2d 293 (Ohio 1990):

6

In August 1983, a burglar broke into John McGrath's East Cleveland home three separate times.  After each break-in McGrath, the murder victim, then seventy-nine years old, called the East Cleveland Police Department.  On August 24, 1983, detectives placed a clean drinking glass upside down over a quarter on McGrath's dining room table.  McGrath called the police in September after another break-in.  As proven by fingerprints, a burglar had moved the glass and taken the quarter.  Three years later, police identified the appellant, Gregory Lott, by his fingerprints as having burgled McGrath's home on September 7, 1983 and stolen that quarter.

On July 12, 1986, McGrath, driving his 1982 Ford Escort, stopped and cashed a check for $21 at a savings and loan.  Patricia Hill, the head teller, described McGrath as chipper, and in fine spirits and good health that Saturday morning.

Two days later, around 9:15 a.m. on Monday morning, July 14, a Cleveland housewife, Diedrea Coleman, noticed that same Ford Escort parked in her neighborhood.  The driver, a young male, remained sitting in the car almost two hours, though he moved it once.  Her suspicions aroused, Coleman walked by the car, looked closely at the driver, noted the license number, and called the police twice that morning from a pay phone a block away.  The car left around 11:20 a.m. and came back thirty minutes later.  Coleman watched the driver walk over to the yard of her elderly neighbors, the Turks.  Coleman later noticed the driver running from the Turks' house carrying a brown bag under his arm.

Shortly afterwards, she and Mr. Turk found Mrs. Turk bruised and shaking with her blouse undone.  Coleman, a trained artist, drew a sketch of the driver for the police.  After the police showed her various photos several times, Coleman on July 28, 1986 identified Lott, from a photo array, as the suspicious Ford Escort driver.

City of Cleveland detectives traced the Escort's license number, discovered it belonged to McGrath, and stopped by McGrath's home.  Unable to get a response, they asked the East Cleveland police to check on McGrath's welfare.  On July 15,

7

uniformed officers stopped by McGrath's house.  Also unable to get a response, they entered through an unsecured kitchen door.  Inside, they found the house in shambles and ransacked, with drawers pulled open and their contents dumped on the floor.

Police found McGrath lying on the floor in a downstairs bedroom. Conscious and moaning, McGrath complained of pain and suffering from burns. It appeared from the scene that McGrath had been doused with flammable lamp oil and then set on fire.  His face also had dried blood on it.  Paramedics rushed McGrath to a hospital.

Treating physicians described the burns as causing a greenish ooze and having the odor of rotting flesh.  When first seen by treating physicians, McGrath was severely dehydrated to a degree consistent with having received burns more than twelve hours old.  The second degree burns, estimated as covering twelve percent to eighteen percent of his body, extended over his right back, right side, lower and upper left side, both arms and both knees.  His initial treating physician, Dr. Bruce Oppenheimer, noted a bruised left eye, apparently caused by a blunt impact injury resulting in swelling and bleeding.  That physician believed, with reasonable medical certainty, that because of McGrath's age, and judging by the appearance and odor of the burns, he would not survive these injuries.

McGrath died in the hospital of acute bilateral bronchopneumonia on July 23, 1986.  Dr. Jay P. Logeman, one of McGrath's treating physicians, noted that the pneumonia was caused by the burn injuries, the lack of early medical treatment for those burns, and the patient's age.  The deputy coroner noted crusted abrasions on McGrath's wrist, knee and ankle.  He ruled the death a homicide.

McGrath's home revealed compelling circumstantial evidence of what occurred.  When found, McGrath wore a blue shirt which covered his burns, but was not scorched itself.  Dried fluids were present on the shirt, and a strong odor was emanating from the burns.  The trousers he wore were burned.  Within a foot of McGrath's body, police found a telephone cord that had a plug on one end and

8

was frayed on the other.  On a nearby cabinet, police found a quart bottle of flammable lamp oil with the cap missing.  The cap was later found on the bed. Only one third of the oil remained.  Charred drapes and a sheet were found on the floor, but police did not see other evidence of a fire.

A burglar had forcibly entered McGrath's home by removing a rear basement window from its frame, leaving a gaping hole.  The burglar had forcibly pried loose an entire panel on the door leading from the basement to the kitchen, splintering the panel into pieces.  Evidence of theft or attempted theft abounded, with drawers in the bedroom and kitchen open and their contents dumped.  The bed's mattress was askew on the box springs.  Police recovered McGrath's Ford Escort in the early morning of July 16.

Various items of evidence linked Lott to this crime.  A shoeprint in the dust in McGrath's bedroom generally matched the pattern found on Lott's tennis shoes. Police recovered those shoes from the trunk of Lott's automobile when they arrested him.  Police found Lott's fingerprints on a church contribution envelope in McGrath's home.  McGrath had received the envelope less than a month before. McGrath did not attend church on Sunday, July 13, though he was very regular in attendance and contributions.  Police also found Lott's fingerprint on a dresser in McGrath's bedroom.  Lott had driven McGrath's stolen automobile more than twenty-eight hours before police found McGrath. Police arrested Lott on July 30, 1986 based on Coleman's identification.

Lott was indicted on three different occasions.  On August 8, 1986 the grand jury indicted him on two counts of aggravated burglary, two counts of aggravated robbery, felonious assault, two counts of kidnaping, aggravated murder with a felony murder specification, and aggravated arson.  On August 12, 1986 the grand jury indicted Lott on four counts of aggravated burglary, felonious assault, four counts of aggravated robbery, kidnaping, gross sexual imposition, and petty theft. Finally, on October 17, 1986, he was re-indicted for aggravated arson.  The indictments alleged crimes against six victims, including McGrath, and contained

9

prior felony and violence specifications.  After arraignment on each indictment, Lott pled not guilty.  Because Lott was indigent, the court appointed counsel to represent him.  On June 23, 1987, Lott waived a jury trial.  Additionally, at the request of the state, the court severed all counts except those relating to McGrath. The court then ordered the trial to proceed, without Lott's objection, for all offenses against McGrath:  aggravated murder;  two counts of aggravated burglary, one for the 1983 and one for the 1986 break-in;  aggravated robbery; kidnaping; aggravated arson;  and petty theft for the 1983 break-in.

On July 13, 1987, a panel of judges tried Lott for all the offenses relating to McGrath.  On July 16, 1987, at the close of the prosecution's case, the court dismissed the kidnaping charge.  The prosecution also was permitted to amend the aggravated murder charge and the felony murder specification in order to delete the references to kidnaping.  On July 17, the court panel found Lott guilty of the aggravated murder of McGrath, two counts of aggravated burglary, aggravated robbery, aggravated arson, and petty theft.  Lott was also found guilty of the death specification of murder during robbery and burglary, and of specifications alleging a prior felony conviction in all charges but the petty theft and one aggravated burglary charge.

Following a sentencing hearing, the trial panel determined, beyond a reasonable doubt, that the aggravating circumstances outweighed any mitigating factors.  Thereafter, the trial court sentenced Lott to death for the aggravated murder, fined him $41,000 and imposed maximum terms of consecutive imprisonment for the other offenses.  On March 27, 1989, the court of appeals affirmed the convictions and death sentence, modified the sentence for one of the aggravated burglary convictions, and disapproved the fines due to Lott's indigency.

(Case No. 95 CV 2642, Doc. No. 109, at 6-9).

### III. FEDERAL HABEAS PROCEEDING

### A. First Federal Habeas Proceeding

Lott's lengthy journey through the federal courts began with the filing of his first federal habeas petition on December 14, 1995.  The procedural history from that proceeding is quoted from the Court's prior Memorandum of Opinion (again, with original footnotes renumbered):

On December 14, 1995, Lott filed a notice of intent to file a habeas petition, a motion to proceed in forma pauperis, and a motion for appointment of counsel.  This Court granted the latter two motions and appointed attorneys Mark DeVan and Dale Baich (who represented Lott during his state post-conviction proceedings)[4] as co-counsel for Lott.

On November 8, 1996, Respondent filed a motion seeking a declaration from the Court that Title I of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies in this case. Lott filed his petition on February 3, 1997, and Respondent filed a return on March 25, 1997.  Lott filed his traverse on May 23, 1997.  Respondent also filed a reply to the traverse, to which Lott responded. On June 19, 1997, the Court granted Respondent's motion in part.  The Court concluded that Section 107 of the AEDPA, which established special, expedited habeas corpus procedures for capital cases originating in "opt in" states, does not apply, but that Section 104, which increases the deference to be given to prior state court determinations of law and fact, does apply.

---

[4]  On September 19, 1996, Baich filed a motion to withdraw as Lott's counsel.  That motion was granted shortly after being filed.  Lori Leon, also with the Ohio Public Defender Commission, then entered an appearance on Lott's behalf.

11

Lott subsequently filed a motion asking that the Court reconsider its ruling that Section 104 applies. Lott argued that his habeas action was "pending," as that term is understood under the AEDPA, at the time of the AEDPA's enactment, and, thus, under Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997), the Act could not be applied retroactively to his claims.  In support of this proposition, Lott asserted that his notice of intent to file a petition and motion for appointment of counsel constituted a pending action. On March 11, 1998, this Court denied that motion, finding that the notice of intent to file a petition and motion for appointment of counsel did not give rise to a "pending" case, and, thus, that his action was not pending at the time of the AEDPA's enactment. Lott v. Coyle, 2 F. Supp.2d 961 (N.D. Ohio 1998) ("Lott I").  The Sixth Circuit recently followed much the same analysis, expressly holding that a notice of intent to file a petition and motion for appointment of counsel do not give rise to a pending case for purposes of the AEDPA. See Williams v. Coyle, ___ F.3d ___, 1999 WL 64556 (6th Cir. Feb. 12, 1999) ("[W]e conclude that a federal habeas corpus case is filed or pending for purposes of Lindh and the AEDPA only when the petition for the writ is filed.").[5]

Lott also filed a motion to expand the record, a motion to correct and expand the record, a motion for leave to conduct discovery, and a motion for an evidentiary hearing.  Lott sought discovery relating to the following claims and

---

[5]     While the Williams panel did not cite this Court's decision in Lott I, it used the identical analysis in arriving at its decision, strongly suggesting that the Lott I ruling will be affirmed.

12

issues: (1) exculpatory evidence; (2) pre-trial identification; (3) ineffective

assistance of counsel; and (4) the medical treatment of McGrath.  On March 18,

1998, the Court granted the motion in part, and allowed Lott to conduct limited

discovery with respect to claims relating to exculpatory evidence, pre-trial

identification, and the medical treatment of McGrath   The Court also granted in

part Lott's motion to correct previously filed portions of the record. The Court

granted in full Lott's motion to expand the record to include handwritten notes

apparently made by a Police Officer who questioned McGrath about his assailant.

According to Lott, the description given by McGrath of his assailant differs from

Lott's actual appearance. The Court permitted Lott to include this in the record

over Respondent's strong objections.  The Court granted Lott until May 15, 1998

to complete the requested discovery.  Finally, Lott sought an evidentiary hearing

on some of his claims.  Respondent opposed the motion on the grounds that Lott

was not entitled to such a hearing under the AEDPA.[6]  Lott failed to address these

arguments, asserting only that the AEDPA does not apply to his case.  In light of

the Court's March 11, 1998 Memorandum & Order denying Lott's motion to

reconsider its ruling on the AEDPA's applicability, the Court allowed Lott until

April 27, 1998 to file a supplemental brief addressing his entitlement to a hearing

under the AEDPA.

Lott timely submitted the authenticated handwritten notes and an affidavit

from counsel regarding those notes. Respondent also timely submitted documents

in compliance with the Court's orders regarding expansion and correction of the

record. Lott, however, failed to submit a brief in support of his entitlement to an

---

[6]  Under the AEDPA:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that —
>     (A) the claim relies on —
>         (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>         (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>     (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

28 U.S.C. §2254(e)(2) (emphasis added). Because Lott is unable to explain when and how he obtained the police notes which purportedly contain a misidentification by McGrath, and has presented no other evidence to suggest the existence of a factual predicate that could not have been previously discovered through the exercise of due diligence, it appears that Lott would be unable to establish his entitlement to an evidentiary hearing under the AEDPA.

14

evidentiary hearing.  On May 22, 1998, after the discovery deadline, Lott submitted a motion to compel discovery and to modify the scheduling order.  In this motion, Lott informed the Court that he had completed all discovery allowed, with one exception: he had not received any records relating to notes, videos, or other recordings of witness statements regarding the McGrath homicide.  Lott thus sought an order compelling compliance with this discovery request and seeking additional time within which to obtain that discovery.

There were several obvious problems with Lott's motion, however.  First, and most fundamentally, the motion sought to extend a deadline which had already expired (and one which had been previously extended), rendering the motion untimely.  Despite this fact, no leave to file an untimely motion was sought.  Second, counsel did not certify, as the local rules require, that good faith efforts to resolve the dispute informally had been unsuccessful and counsel never attempted to resolve the discovery problem through a telephone conference with the Court as required under Local Rule 37.1.  Finally, it was obvious from the face of the motion that the motion itself was, at best, unnecessary.[7]  For all these

---

[7]  In the affidavit attached to this motion, Lott's counsel noted that the City of Cleveland explained to him that, <u>following a search</u>, it could locate none of the documents relating to the McGrath homicide that fell within the scope of this Court's order.  Lott's counsel further stated that the City of Cleveland informed him that they would continue to look for information in other files which went beyond the limited scope of this Court's order.  Lott's own motion thus appeared to moot the request for relief.  The Court cannot compel the production of records that do not exist.  The City of Cleveland was neither attempting to avoid a lawful subpoena, nor  being obstinate regarding its discovery obligations; from the face of the motion, it appeared, instead, that the City of Cleveland had made good faith efforts to locate the records, but had been unable to do so.

reasons, the Court concluded that the motion had never been lodged properly with

the Court.

(Case No. 95 CV 2642, Doc. No. 109, at 10-14).

The Court issued it Memorandum of Opinion and Order denying Lott habeas relief on

March 31, 1999.  (Case No. 95 CV 2642, Doc. No. 109).  In that Opinion, the Court found that

Lott's claim raised pursuant to Brady v. Maryland, 373 U.S. 83 (1963), was both procedurally

defaulted and alternatively lacked merit.  Lott raised this claim asserting that the State failed to

inform him that no fingerprints were found on McGrath's car.  Additionally, he asserted that the

State failed to provide him with McGrath's first interview with police, during which he provided

a description of his assailant that, Lott maintained, differed from his own.  (Case No. 95 CV

2642, Doc. No. 109, at 56).

The Respondent argued that both sub-parts of Lott's Brady claim were procedurally

defaulted.  The Court agreed, finding Lott had failed to raise them at any juncture of his state-

court appeals.  Moreover, the Court noted Lott's counsel's lack of cooperation in revealing when

and how he obtained the police statements containing McGrath's description.  It observed, "the

question of when and how Lott and his counsel first learned of this information was put to

counsel directly, but counsel could not or would not provide an answer."[8]  Id. at 60.

Notwithstanding the procedural default, the Court held that Lott's claim likely would not

have been well-taken even if it were preserved for federal habeas review because, it opined:

---

[8]     Prior habeas counsel were subsequently referred to the Court's Committee on
        Complaints and Policy Compliance for their failure to be forthright with the Court
        regarding post-conviction counsel's receipt of these material.  (Case No. 95 CV
        2642, Doc. No. 131).

16

(1) McGrath obviously was not present at trial to identify Lott, making his prior

description useless for impeachment purposes, and (2) defense counsel's

strenuous and successful argument at trial that statements McGrath made

regarding his assailant and the assault itself constituted inadmissible hearsay [that]

likely would have prevented admission of all such statements.

Id. at 60-1.  Finding that no other claims warranted the granting of habeas relief, the Court denied

Lott's first federal habeas petition.

Lott appealed this Court's decision to the Sixth Circuit Court of Appeals.  On August 17,

2001, the Court issued an opinion affirming this Court's decision.  Lott v. Coyle, 261 F.3d 594

(6th Cir. 2001).  In its review of the Brady claim Lott raised, the Court first held that the absence

of fingerprints sub-claim, the victim identification sub-claim, and the sub-claim pertaining to an

oil lamp found in McGrath's possession were all unexhausted because Lott had never raised a

Brady claim on these grounds in state court.

The Court then reviewed each sub-claim individually, finding that they were procedurally

defaulted, failed on the merits, or both.  Examining the lack of Lott's fingerprints on McGrath's

car, the Sixth Circuit acknowledged that this evidence would have undercut Coleman's testimony

that she had viewed Lott in McGrath's car in her neighborhood.  Affirming this Court's

conclusion that raising this issue on direct appeal as an ineffective assistance of counsel claim

was distinct from raising this issue as a Brady claim, the Sixth Circuit found that this sub-claim

was procedurally defaulted.

The Court then reviewed the McGrath description of his assailant sub-claim.  It affirmed

this Court's opinion that Lott's failure to raise a Brady claim based on these factual

17

underpinnings led to its procedural default.  Id. at 619.  It also held, like this Court, that, even if

Lott had not procedurally defaulted this claim, he would have had difficulty demonstrating that

the claim was based on materials outside the record or that the information supporting this claim

became available to him only after his avenues for state court relief were no longer available.  Id.

at 619.  The Sixth Circuit applied similar logic when reviewing the defaulted status of the oil-

burning lamp sub-claim, finding that, because Lott never raised it in state court, the Court was

foreclosed from reviewing it.

By far the most noteworthy portion of the Sixth Circuit's opinion was its analysis of

Lott's assertion that he could excuse his defaulted Brady claims by demonstrating cause and

prejudice and/or a miscarriage of justice.  Although Lott had asserted that counsel's failure to

raise the McGrath identification claim could serve as cause to excuse any default, the Lott Court

disagreed, holding:

> First, as the district court noted, Lott's counsel might reasonably have made a
> strategic decision not to raise this claim, particularly in light of the fact that the
> description provided by McGrath was not so materially different from Lott's
> actual appearance as to have affected the outcome of the trial.  Second, the district
> court also observed that even if Lott's claim had been properly raised, it would
> have likely been rejected, both because McGrath's absence from trial made his
> prior description unnecessary for impeachment purposes, and because Lott's
> counsel successfully argued at trial that McGrath's statements were inadmissible
> hearsay.  We agree and cannot conclude that the failure of Lott's counsel to assert
> this claim was an error of constitutional magnitude sufficient to establish cause for
> his default.

Lott v. Coyle, 261 F.3d at 620.

Finally, the Lott Court resolved the issue of whether Lott could use the miscarriage of

justice exception, demonstrating that he was actually innocent of McGrath's murder, to surmount

the procedural default hurdle.  It held that Lott could not so demonstrate.  While it found Lott's

18

conviction, which was based primarily on circumstantial evidence, to be "troubling," it reviewed

the police report containing Lott's statement.  Id. at 621.  Observing that the panel that convicted

Lott did not review this statement because police had obtained it in the absence of Lott's counsel,

the Sixth Circuit reasoned that, "a habeas court may take it into account in evaluating his claim

of miscarriage of justice due to actual innocence."  Id. (citing Schlup v. Delo, 513 U.S. 298, 327-

28 (1995))(further citations omitted).  In reviewing the evidence that was both presented at trial

and that which had surfaced since that time, the Court found Lott could not establish his actual

innocence sufficient to overcome the procedural bar.  It reviewed the evidence as follows:

> A more detailed review of the circumstances than appears in this record may show
> that Lott's inculpatory statement, although suppressed at trial, was voluntarily
> made and admits of no reason to doubt its reliability or truthfulness.  Though Lott
> said he did not recall setting the fire that burned McGrath, the State introduced
> evidence of Lott's fingerprints in the victim's home, his possession of the victim's
> car, and a shoeprint in McGrath's bedroom that generally matched Lott's shoes.

Id.  Noting that this claim was pending before the state courts, and that it had not been fully

briefed by the parties, the Sixth Circuit declined to reach a conclusion regarding the impact Lott's

confession had on his actual innocence in addition to the circumstantial evidence presented at

trial.

### B. Second Federal Habeas Litigation

Scheduled to be executed by the State of Ohio on April 27, 2004, Lott filed an application

to file a second or successive petition in federal court pursuant to 28 U.S.C. § 2244(b).[9]  The

---

[9] That statute states in pertinent part:
The court of appeals may authorize the filing of a second or successive
application only if it determines that the application makes a prima facie
showing that the application satisfies the requirements of this subsection.
28 U.S.C. § 2244(b)(3)(D).

Sixth Circuit granted the application, holding that the Brady claims based on Lott's actual innocence had been raised and adjudicated in state court since its prior opinion.  In re Lott, 366 F.3d 431, 437 (6th Cir. 2004).  Finding that Lott had met the "lenient" prima facie standard set forth in the statute, the Sixth Circuit held that Lott was entitled to file a second or successive habeas petition in this Court asserting that, because of prosecutorial misconduct, Lott was not in possession of information during trial that demonstrated: (1) that McGrath identified his assailant as a light complected, long-haired, African-American male; (2) that McGrath had identified his assailant as someone he knew from his barber shop; and, (3) that, contrary to the prosecutor's assertions during trial, McGrath owned a kerosene lamp that used oil similar to that which burned McGrath.  Id. at 433.   Accordingly, the Sixth Circuit granted the application, permitting Lott to file a second or successor petition for a writ of habeas corpus with this Court.[10]

### 1. Second habeas petition

---

[10]      Chief Judge Boggs filed a lengthy dissent.  He first argued that Lott's Brady and actual innocence claims were raised and decided in Lott's first habeas petition. Although the majority found that Lott's pending application represented the first time the "factual predicate" for Lott's Brady claims based on actual innocence could be adjudicated in federal court, Judge Boggs "clarified" that the "factual predicate" for both Lott's Brady and actual innocence claims were identical.  By recasting the claims, he concluded, the majority had allowed Lott to do an end-run around the AEDPA's strict prohibition on filing successive petitions.  Observing that the evidence supporting Lott's actual innocence claims came to light in 1991, Judge Boggs found that Lott failed act with due diligence in presenting his claims. He concluded that Lott could not satisfy § 2244(b)(2)(B)(i) and thus was not entitled to file a successive petition.

Aside from Lott's failure to be diligent, Judge Boggs also noted that the evidence Lott asserted was withheld from him did not support his innocence. Indeed, he concluded that the showing Lott made in support of his actual innocence claim fell "far short of the requirement of producing 'clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty of the underlying offense'" pursuant to § 2244(b)(2)(B)(ii).  In re Lott, 366 F.3d at 437.

Pursuant to In re Lott, 366 F.3d 431 (6th Cir. 2004), Lott filed his second or successive petition in this Court on May 4, 2004, opening case number 1:04 CV 822.  (Doc No. 1).  The Respondent filed a second return of writ on June 6, 2004,  (Doc. No. 8), to which Lott filed a second traverse on July 29, 2004.  (Doc. No. 13).  The Respondent thereafter filed a reply to the traverse.

On August 13, 2004, Lott filed a motion for an evidentiary hearing.  (Doc. No. 16). That same day, the Respondent filed a motion for discovery, requesting that the Court grant her leave to depose trial, appellate, and post-conviction counsel, Lott, and several individuals involved with the McGrath murder investigation or McGrath's hospital care.  The Court denied Lott's motion without prejudice, reserving judgment on whether a hearing was necessary until after the parties had completed discovery.  (Doc. No. 44, at 26).  The Court granted in part and denied in part the Respondent's motion for discovery.  Id.  Although the Court denied some of the Respondent's requests on the grounds that depositions of some individuals would not be as reliable as statements or impressions they provided at the time of McGrath's death, it granted the Respondent's request to depose trial counsel, Lott, and several individuals who were involved in the murder investigation.  Because Lott placed his confession to Detective James Hughey at issue by asserting his actual innocence, the Court permitted the Respondent to depose Lott and his trial counsel regarding any statement Lott may have made that was contrary to his more recent assertion that he had never confessed to Detective Hughey.

In response to the Court's order, Lott filed a petition for a writ of mandamus in the Sixth Circuit Court of Appeals, seeking to prevent the Respondent from questioning him or his trial counsel regarding any inculpatory statements.  The Sixth Circuit issued the writ.  In an opinion

21

issued September 9, 2005, the Court found that Lott's assertion of actual innocence did not implicitly waive the attorney-client privilege or work product privilege.  In re Lott, 424 F.3d 446 (6th Cir. 2005).  Thus, it proscribed the Respondent from questioning Lott or his counsel regarding any conversations they had pertaining to his innocence.  After the United States Supreme Court received and denied the Respondent's petition for a writ of certiorari on this issue, the parties conducted discovery.

Lott filed a renewed motion for an evidentiary hearing after discovery was complete.  The Court granted the motion in regards to the identification and the lamp oil issues.  The Court sets forth the testimony presented at the hearing in detail below.

## 2. Evidentiary hearing

The Court conducted an evidentiary hearing on June 5, 2007.  Prior to calling witnesses, the Court heard opening statements from the parties.  At that time, Lott's counsel argued, as they had previously, that Lott was asserting a "hybrid" actual innocence/Brady claim, which counsel maintained was created by language found in Schlup v. Delo, 513 U.S. 298 (1995).  When the Court questioned counsel about whether they had any authority to support this contention, counsel conceded that this argument was "creative."  (Doc. No. 85, at 4).  The Court also asked whether counsel actually were attempting to use actual innocence, pursuant to the Schlup standard, to excuse an otherwise defaulted Brady claim.  Counsel responded that in successive habeas litigation, Schlup "actually creates a substantive right of actual innocence unto its own by way of linking to or arising out of a constitutionally unfair trial."  Id. at 6.  Ultimately, after reading portions of the most recent Supreme Court case to adjudicate an actual innocence claim under the Schlup standard, i.e., House v. Bell, – U.S. – , 126 S.Ct. 2064 (2006), at the Court's

22

request, counsel conceded that the Court must operate pursuant to a <u>Schlup</u> standard.

The Court then questioned habeas counsel regarding procedural default.  Counsel conceded that post-conviction counsel purposely withheld documents from the state courts to by-pass an adjudication of Lott's <u>Brady</u> claim until reaching federal court.  The Court then queried whether the claim Lott was asserting truly was an actual innocence claim, since Lott had been in possession of all documents supporting his claim during his state court proceedings.  Thus, the Court reasoned, pursuant to <u>Schlup</u>, there was no "new" evidence that has come to light.  <u>Id.</u> at 9.  Moreover, the Court observed, the state court had barred Lott's successor post-conviction petition on grounds of res judicata.  Acknowledging that there was absolutely no authority to support the contention, counsel contended in any event,  that "the degree of ineptitude of [post-conviction counsel] combined [to] give a legal basis to excuse . . . the due diligence default."  (Doc. No. 85, at 8).

After opening arguments, habeas counsel called James Kersey, Lott's trial counsel, as the first witness.  After asserting that Lott had a medium to dark complexion, Kersey stated that, had he been provided with any information alleging that McGrath's assailant had a light complexion, he would have conducted a followup investigation and would have raised the issue during trial.  Specifically, he stated that he would have used this information to undermine Ms. Coleman's trial testimony.  Kersey also stated that he was never informed that McGrath identified his assailant as someone who he had seen at his barbershop.  He also maintained that he was never made aware that police officers had told Coleman that they had found skin-lightening makeup among Lott's possessions.  On cross-examination, Kersey admitted that he and co-counsel knew that there was no evidentiary support for the prosecutor's comment that Lott had brought lamp

23

oil with him with the intent of burning McGrath.

Habeas counsel called Dori Kyle, Lott's ex-sister-in-law, to testify about Lott's appearance during the summer of 1986. She asserted that Lott's complexion had been consistent, disavowing the theory that he ever used skin-lightening makeup. Moreover, she stated that, during the summer of 1986, Lott never had long hair, contrary to McGrath's description of his assailant.

Art McCoy next testified for Lott. McCoy owned a barbershop in McGrath's neighborhood at the time of the murder and testified that McGrath was a regular customer. (Doc. No. 85, at 54). He was uncertain, however, whether Lott was ever a customer. On cross-examination, McCoy admitted that Lott had been in and around his barbershop on several occasions, and that McGrath may have seen Lott there. Id. at 59-60.

Habeas counsel's final witness was James Copeland, a police detective for the East Cleveland Police Department at the time of the McGrath murder investigation. He testified that, although he had no independent recollection of interviewing McGrath at the time, according to his ordinary custom and routine, he would not have interviewed McGrath if he had any doubts regarding the reliability of the information McGrath provided due to his medical condition. Id. at 67.

During closing statements, the Court reiterated its conclusions regarding the type of claim it believed Lott was permitted to raise, reasoning: "the best I can conclude is that the Sixth Circuit is allowing you to attempt through an actual innocence claim to create a gateway to assert your Brady claim I previously found to be procedurally defaulted." Id. at 75. It thus surmised that it must undertake a three-step process to adjudicate Lott's claims: First, it must determine

24

under Schlup whether Lott could excuse the procedural default for his claim, it must next discern whether there was any Brady material that was actually exculpatory and withheld from the defense, and, finally the Court held that, as a corollary to its Brady review, it must determine whether any exculpatory items withheld from the defense were material to the outcome of Lott's trial.

In concluding the hearing, counsel argued that the Court could not consider Lott's confession when reviewing his claim.  The Court disagreed, finding that, pursuant to the House holding, it could  and, indeed, should consider Lott's confession.  The transcript of the hearing was submitted for filing on August 28, 2007.  (Doc. No. 85).

## IV. ACTUAL INNOCENCE

### A. Standard Of Review

### 1. 28 U.S.C. § 2244(b)

Prior to adjudicating whether Lott is entitled to excuse any procedural default he may have incurred in raising his Brady claims, the Court first must decide whether Lott meets the requirements to bring a second or successive petition pursuant to 28 U.S.C. § 2244(B)(4).  That statute requires a district court to dismiss a successive petition unless the applicant "satisfies the requirements of this section."  28 U.S.C. § 2244(b)(4).  The term "this section" refers to the requirements set forth in § 2244(b)(2).  That statute states that a claim presented in a second or successive petition must be dismissed unless the applicant can either (A) demonstrate that a new rule of constitutional law made retroactive is applicable to the claim (a circumstance not at issue here) or, (B), demonstrate that:

> **(B)(i)** the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; **and**

25

> **(ii)** the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2)(B)(emphasis supplied).  Thus, to be entitled to a review on the procedural default or merits of his claims, this Court must find that Lott satisfies a two-pronged test.  First, it must determine whether Lott was diligent in discovering his claims.[11]  The above requirements differ from those the Sixth Circuit employed when it found in In re Lott, 366 F.3d 431 (6th Cir. 2004), that Lott was entitled to file his second petition in the first instance.[12]

Because few successor petition applications obtain circuit court approval, it is not surprising that there are few district court applications of § 2244(b)(4).  One other Court in this Circuit has, however, adjudicated this issue.  In Morris v. Carlton, No. 1:04-cv-247, 2006 WL 2639497 (E.D. Tenn. Sept. 13, 2006), the district court determined that a petitioner's successive petition could not satisfy the due diligence requirement set forth in the statute.  It first examined

---

[11]     This requirement is similar, but not identical to, the diligence requirement that entitles a habeas petitioner to an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2).  When seeking such a hearing, a petitioner is entitled to an evidentiary hearing if he demonstrates that he did not "fail to develop the factual basis of a claim in State court proceedings . . . ."  28 U.S.C. § 2254(e)(2).
         Although the subject of whether Lott met this standard was considered during the evidentiary hearing, the Court finds that Lott has met this standard by pursuing a second petition for post-conviction relief on this issue in state court.

[12]     A circuit court determines only that a habeas petitioner has made a prima facie showing of the requirements of § 2244(b)(2) as set forth in § 2244(b)(3).  See also Tyler v. Cain, 533 U.S. 656, 661 n.3 ("As noted above, a court of appeals may authorize such a filing only if it determines that the applicant makes a 'prima facie showing' that the application satisfies the statutory standard.  § 2244(b)(C)(3).  But to survive dismissal in district court, the applicant must actually "sho[w] that the claim satisfies the standard.").

26

when a reasonable petitioner would have discovered the materials giving rise to the claim raised in the successive petition.  After ascertaining this date, the Morris court next considered whether the petitioner had filed the petition within one year of that date.  Id. at *5.  Finally, it held that the "due diligence requirement is considered in light of the totality of the circumstances, including a petitioner's confinement in prison."  Id.  Subjecting the petitioner's claim to this analysis, the Morris court found that the petitioner could have discovered the factual predicate of his claims within the one-year limitations period and therefore dismissed the petition because the petitioner could not demonstrate due diligence.

Few courts have adjudicated the second, or "actual innocence" prong, of § 2244(b)(2)(B)(ii).  Those that have opined on this statutory requirement have held that it is more stringent than the actual innocence standard set forth in Schlup.  As the Sixth Circuit reasoned in dicta, § 2244(b)(2)(B)(ii):

> adopts Sawyer [v. Whitley, 505 U.S. 333 (1992)]'s more strenuous requirement of 'clear and convincing evidence' of actual innocence, rather than Schlup's required showing that it is 'more likely than not' that a jury would not convict the petitioner. At the same time, the provision requires the petitioner to prove that 'no reasonable factfinder would have found the applicant guilty of the underlying offense."

Ross v. Berghuis, 417 F.3d 552, 557 n.4 (6th Cir. 2005)(emphasis in original).  Thus, prior to adjudicating his claims, the Court must first decide whether Lott meets the higher threshold

27

showing of actual innocence to avoid dismissal under the statute.[13]

## 2. Schlup v. Delo

Out of an abundance of caution and for appellate review, the Court will, regardless of its findings pertaining to Lott's actual innocence under the statutory standard, also subject his actual innocence claim to the standard set forth in Schlup v. Delo, 513 U.S. 298 (1995).  As the Court reasoned during the evidentiary hearing, this is the standard that Lott must meet to excuse the procedural default of his Brady claims.[14]

In Schlup v. Delo, the Supreme Court held that, where a petitioner seeks to utilize claims of actual innocence as a gateway to assert he was wrongly convicted of a crime, the petitioner must demonstrate that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Id. at 327 (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986)).  To

---

[13]  Before applying this standard to Lott's actual innocence claim, the Court must address an issue the Respondent raised in her second return of writ.  Therein, she contends that Lott's claims are barred by the AEDPA's statute of limitations set forth in 28 U.S.C. § 2244(d).  While there is some merit to this argument under the holding of Mayle v. Felix, 545 U.S. 644 (2005), in which the Supreme Court held that new facts asserted in an amended petition did not relate back to the filing of the initial petition for purposes of satisfying the one-year statute of limitations requirement, the Sixth Circuit has held that § 2244(d) is subject to equitable tolling on grounds of actual innocence based on the Schlup standard.  Souter v. Jones, 395 F.3d 577, 590-91 (6th Cir. 2005).  Accordingly, if the Court finds that Lott can meet the more stringent § 2244(b)(2)(B)(ii) actual innocence standard, then it stands to reason that he could equitably toll the statute of limitations, thereby preserving his claims for federal habeas review.

[14]  Although the issue of whether the Schlup standard survived the enactment of the AEDPA was raised during the evidentiary hearing, it is a settled question that Schlup remains intact.  See House v. Bell, – U.S. – , 126 S.Ct. 2064, 2078 (2006)(finding Schlup remains the standard for determining actual innocence in first federal habeas petitions in which the petitioner seeks to excuse the default of those claims based on a showing of actual innocence);  Williams v. Bagley, 380 F.3d 932, 973-74 (6th Cir. 2004).

constitute the necessary "probability," the petitioner must show "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." Id.  Thus, the Schlup Court concluded, if a habeas petitioner presents evidence of his innocence that is so strong that a habeas court cannot have confidence in the trial's outcome unless it is also of the belief that the trial was free of constitutional error, a habeas petitioner should be entitled to a merit review of his underlying claims. Id. at 316.

The Supreme Court revisited the Schlup holding in House v. Bell, – U.S. – , 126 S.Ct. 2064 (2006).  There, the petitioner asserted that multiple facts that had come to light since the time of his state court proceedings could establish his actual innocence as a gateway to excuse the procedural default of the claims raised in the petition.  Reversing the Ninth Circuit's denial of this relief, the Supreme Court held that the petitioner had met the Schlup standard.

Prior to applying this standard to the facts presented, the House Court underscored several aspects of the Schlup holding that are of particular significance here.  First, the House Court noted that, while Schlup requires the introduction of new, credible evidence that was not presented at a petitioner's trial, a habeas court is not limited to such evidence in its actual innocence review. Id. at 2077.  The House Court also emphasized that "'the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" Id. (quoting Schlup, 513 U.S. at 327-38)(emphasis supplied).

### B. Substantive Analysis

### 1. 28 U.S.C. § 2244(b)

As noted above, the Court must now apply the claim Lott raised in the successor petition

29

to the requirements set forth in § 2244(b).  As Lott does not contend that the Supreme Court has

created a new rule of constitutional law made retroactive to him under § 2244(b)(2)(A), the Court

will review his claim pursuant to § 2244(b)(2)(B).  That statute requires Lott to demonstrate both

that he could not have previously discovered the factual predicate of his claims, and that he can

establish, by clear and convincing evidence, that he would not have been convicted but for

constitutional error.[15]  The Court reviews each of these statutory prongs, finding that Lott can

satisfy neither.

### a. § 2244(b)(2)(B)(i)

Lott's failure to present his <u>Brady</u> and actual innocence claims in a timely fashion is

undisputable.  As Lott concedes in the successor petition, Lott's post-conviction counsel obtained

the City of Cleveland and Cuyahoga County Prosecutor's Office records that form the basis of

his <u>Brady</u> and actual innocence claims by October, 1991.  Although Lott could have presented

these claims based on this information to the state court at that time, he failed to do so.  Current

habeas counsel concede that post-conviction counsel "engaged in an 'intentional bypass'" of the

state courts in the hopes that the federal courts would more thoroughly consider the documents.

(Doc. No. 1, at 24).  Thus, there is no doubt that Lott fails to demonstrate that he could not have

---

[15]     Although the Court holds elsewhere in this Opinion that Lott has satisfied the
diligence requirement of § 2254(e)(2), it notes that the difference in that statute's
language from § 2244(b)(2)(B)(i) is significant and requires the Court to perform
a distinct analysis.  While § 2254(e)(2) merely requires that the petitioner not have
"failed to develop" his claims in state court, a requirement Lott clearly has
fulfilled by filing a second petition for post-conviction relief, § 2244(b)(2)(B)(i)
requires that an applicant acted <u>timely</u> in presenting newly discovered materials to
the state courts.

discovered the factual predicate of his claims previously, as is required under the statute.[16]

### b. § 2244(b)(2)(B)(ii)

Even if Lott could satisfy the requirements of § 2244(b)(2)(B)(i), he cannot demonstrate, by clear and convincing evidence, that no reasonable factfinder would have convicted him of McGrath's murder if no Brady violation had occurred at his trial.  The Court sets forth below the evidence presented at trial and during the federal habeas proceedings.

### i. Evidence presented at trial

The Court briefly reviews the most inculpatory evidence the prosecution presented during Lott's trial.  The Court acknowledges that the majority of this evidence is circumstantial.  The prosecution presented the testimony of several police detectives who stated that a shoe print found in the dusty floor of McGrath's bedroom generally matched a pair of shoes found in Lott's possession.  Moreover, the prosecution presented testimony that Lott's fingerprints were on a church envelope that recently had been mailed to McGrath, and another fingerprint matching Lott's was found in McGrath's bedroom.  And, the prosecution presented uncontroverted evidence that Lott had been in McGrath's home on prior occasions and was, thus, obviously familiar with the home and with the fact that the home belonged to McGrath.

------

[16]  Attempting to circumvent this quandary, Lott's counsel asserted during the evidentiary hearing, as stated above, that "the degree of ineptitude by [post-conviction and first habeas counsel] combined give a legal basis to excuse . . . the due diligence default."  (Doc. No. 85, at 8).  Counsel conceded that this argument currently has no legal support.  Id. at 10.

  The Court cannot forgive Lott's lack of due diligence because there is simply no authority for what amounts to Lott's ineffective assistance of collateral counsel claim.  In fact, the Supreme Court has held explicitly that no such constitutional right exists.  Pennsylvania v. Finley, 481 U.S. 551, 557 (1987); 28 U.S.C. § 2254(i).

The only direct evidence linking Lott to McGrath's murder was the testimony of Diedrea Coleman.  Coleman identified Lott from a photo array as the man who she had seen driving a Ford Escort, which was later determined to be McGrath's, in her neighborhood.  She stated that her suspicions became aroused when she viewed Lott around her neighbor's home.  She later observed Lott departing quickly from that area holding a brown bag or shirt under his arm.

### ii. Materials in support of actual innocence acquired since trial

### a. Identification Issue

Lott's identification claim contains several sub-parts.  First, he maintains that McGrath failed to identify him as the assailant because of his description regarding the complexion, hair, and height of the assailant.  Lott also notes from the police report containing this description that McGrath believed that he recognized his assailant from his barbershop.  Lott also asserts that Coleman's artist sketch of him and her description of him as having a "reddish" complexion demonstrates his innocence.  Moreover, he contends, police suggested to Coleman that Lott altered his skin tone by using skin-lightening makeup.

### i. McGrath identification

The Court finds that, while parts of McGrath's description of his assailant may support Lott's actual innocence, it by no means proves it by clear and convincing evidence.  In his first habeas petition, the Court alternatively held that, even if not defaulted, Lott's claim regarding McGrath's identification of him would not have been well-taken because McGrath's "description is not so contrary to Lott's actual appearance that it would have made a material difference in the outcome of Lott's trial."  (Case No. 95 CV 2642, Doc. 109, at 60).  Upon review of the evidence and testimony presented during the evidentiary hearing, the Court's conclusion remains

32

unaltered.  As stated above, Art McCoy testified during the evidentiary hearing that McGrath frequented his barbershop during the summer of 1986.  He stated that McGrath would receive a haircut approximately every two to three weeks.  (Doc. No. 85, at 54).  Thus, it is fair to assume that McGrath was referring to McCoy's barbershop when mentioning it to the police.  McCoy also testified during cross-examination that Lott frequented the area around the barbershop.  Id. at 59.  He conceded, moreover, that Lott actually entered the barbershop on several occasions.  Id. Thus, McGrath's barbershop statement only serves to undermine Lott's innocence claim.

McGrath's physical descriptions of Lott, however, are less clear cut.  While the Court, as stated above, finds consistent with its earlier conclusion that McGrath's description does not depart *significantly* from Lott's actual appearance, particularly his description of Lott's height, which varied only two inches from Lott's actual height, the other aspects of the identification present some discrepancies that are inexplicable.  Lott's complexion, upon observation, cannot be characterized as "very light," as McGrath described him.  Less significant was Lott's hair length, a physical characteristic which was readily changeable.  Kyle testified at the hearing that Lott's hair length remained constantly short throughout the summer of 1986.  While the Court does not suspect the veracity of Kyle's recollection, it also is mindful that Kyle's memory of Lott's hair length, a fairly insignificant fact given the events of that summer, could have been mistaken.  In sum, the Court finds that the only evidence supporting Lott's actual innocence based on McGrath's identification of him is McGrath's description of his complexion.

Viewing this description in light of the time and condition in which it was received serves to undercut its import, however.  Although Detective Copeland testified during the hearing that, pursuant to his typical practice and routine, he would not interview a victim unless lucid, it is

33

undeniable that McGrath's age, and certainly his medical condition at the time of the statement, must be considered when assessing its significance.  Along with his physical description of Lott, McGrath also stated during the identical police statement that, "the suspect came back on Monday and let him [McGrath] drive his [own] car."  (Doc. No. 17, Exh. B, at 1).  He thereafter stated that "he was not sure if this happened or not."  Id.  These statements hardly inspire confidence that McGrath's description, supplied two sentences later, was accurate.[17]

### ii. Coleman identification

Lott raised the issue of Coleman's identification of him, albeit pursuant to another claim, in his first federal habeas petition.  The Court found Coleman's description of Lott, crafted after she had viewed him perusing her neighborhood, to be credible because

> she had a reason to observe him, thus suggesting that she would pay a close degree of attention to his appearance (and would have reason to remember it). The fact that she described Lott as having worn a running suit which was identical to the one found in Lott's car also makes her identification more reliable. Though there are factors, including the apparent differences between Coleman's sketch of the man she saw and Lott's actual appearance, which somewhat weaken the reliability of the identification, they do not render the Ohio court's reliability determination unreasonable . . . .

(Case No. 95 CV 2642, Doc. 109, at 65).

Moreover, Coleman's assertion that Lott had a "reddish" complexion is less compelling when taken in the context of her trial testimony.  When defense counsel questioned her on cross-examination regarding the "reddish" pigment she described as Lott's skin tone, she elaborated as

---

[17]  Lott also raised the issue that McGrath failed to identify Lott from the composite sketch created by Coleman. A review of the police report depicting this display reveals, however, that McGrath merely was not responsive when shown the sketch. He died several hours later.  (Doc. No. 17, Exh. C).  Thus, the Court does not consider this fact to be helpful to Lott.

follows:

> A:  Like you have got some black people who have a bluish tone, and some
>
> have a yellowish undertone, and some have - - like tannish.  You have
>
> different shades, variations.

(Trial Tr., at 136).  She also admitted that her sketch of Lott was not a "true rendering" of Lott's

features.  Id. at 131.  She stated that she was not attempting to be accurate, instead choosing to

prepare a sketch quickly so that police could apprehend the individual.  She had expected that a

police artist would subsequently enhance the drawing because "they [were] trained in that field,"

and she was not.  Id.[18]

### b. Lamp oil issue

During closing arguments at trial, the prosecutor argued that Lott had brought lamp oil

with him to McGrath's home, intending to set him afire.  The records post-conviction counsel

received in 1991 reveal that, among McGrath's possessions, was a kerosene lamp that would

have used lamp oil to be ignited.  Lott asserts that the prosecutor's argument that there was no

reason for McGrath to have lamp oil in his home was an outright fabrication to prove the element

---

[18]     Lott also raised the issue about whether Lott used skin-lightening makeup
to alter his skin tone.  As Lott observes, there is nothing in the trial record to
support the assertion that Lott ever used skin makeup to alter his complexion.
The issue was raised as conjecture during the trial and deposition testimony of
Coleman.  Lott asserts the Respondent raised this issue to deflect the obvious
discrepancy between McGrath's description of his assailant and Lott's actual skin
tone.

As Judge Boggs found in his opinion dissenting from the Sixth Circuit's
grant of permission to file a second habeas petition, the skin-lightening theory
"seems unlikely."  In re Lott, 366 F.3d 431, 437 (6th Cir. 2004)(Boggs, J.,
dissenting).  Given the fact that the Court already has called McGrath's
identification of Lott into question because of his medical condition at the time he
provided the description, the Court declines to speculate further on this issue.

of Lott's intent to kill.

During closing statements, the prosecutor attempted to counter defense counsel's

assertions that McGrath may have accidentally ignited himself by arguing as follows:

> The physical examination of his house unquestionably shows aggravated
> burglary and aggravated robbery as stated in the indictment and the laws of the
> State of Ohio.  But to consider the specific intent that the killer had to kill Mr.
> McGrath.
> I'm not going to even seriously consider those suggestions made by
> defense counsel concerning the bottle of lamp oil.  Nothing in that man's house
> that uses kerosene or lamp oil.  So, with that in mind, consider the intent of the
> individual who would break into an old man's house, knowing the frailty that age
> has inflicted on him, bringing with him a cord to tie him up and the lamp oil to
> burn him.
> You may argue that a person that has a gun and kills somebody does it by
> accident, a knee jerk reaction or a spasm, or for some reason reacted to some fear
> instilled by the victim.
> You cannot but look upon this act as deliberate, vile and specifically
> intending to cause the death of Mr. McGrath; that he was tied up and that the
> killer poured this flammable substance on him and ignited him.

Trial Tr. at 778-79.

The Court finds that, while the prosecutor's assertions regarding the lamp oil may be the

subject of a prosecutorial misconduct claim, they are immaterial to Lott's claim of actual

innocence.  As Judge Boggs observed in his dissent from the granting of the application to file a

successor petition:

> Assuming that McGrath owned the oil, it was available to Lott, who used it in his
> attack on the victim.  Were this an argument about prosecutorial misconduct in
> the penalty phase of a capital trial, I would see the relevance.  In this context, I
> cannot draw any inference from the oil that indicates Lott's innocence.

In re Lott, 366 F.3d 431, 437 (6th Cir. 2004).  Although his opinion is not binding on this Court,

the Court finds Judge Boggs's reasoning to be persuasive.  Moreover, during the evidentiary

hearing, defense counsel Kersey admitted that he and co-counsel were aware that there was no

36

evidence to support the prosecutor's statement that Lott brought the lamp oil with him.  (Doc. No. 85, at 43).

Because Lott was tried before a three-judge panel, this Court must assume that the panel was aware of the lack of evidentiary support for the prosecutor's claim.  The panel also was well aware that the prosecutor's argument did not constitute evidence during the trial.  Thus, Lott is hard pressed to demonstrate that the comment had any effect on the outcome of the trial or has any relevance here.  The Court finds that the fact that a kerosene lamp was found in McGrath's home does not tend to demonstrate Lott's actual innocence.

### iii. Lott's confession

As the <u>House</u> Court dictates, this Court must consider all evidence, both inculpating and exculpating, when reviewing an actual innocence claim.  <u>House v. Bell</u>, 126 S.Ct. at 2077; <u>Lott v. Coyle</u>, 261 F.3d at 621.  Thus, while this statement was suppressed before trial and the panel did not consider it because Lott's counsel was not present when it was given, the Court now considers the statement Lott made to Detective James Hughey after his arrest when assessing his actual innocence.  The police report containing this statement reads as follows:

> When questioned about the above incident with Mr. John McGrath he started crying.  He stated he never intended to hurt Mr. McGrath.  He went over to Mr. McGrath's house at 7:00 a.m. sometime in the middle of July and went to the back of the house and broke out a basement window.  He went into the house and found Mr. McGrath in a front bedroom on the main floor of the house.  He stated that the next thing he knew Mr. McGrath was tied up.  He remembers using either a telephone cord or electrical wire to tie him up.  McGrath wasn't in bed when this took place but he doesn't remember or know why he wasn't.
>
> After he was tied up he took his car keys which were on a dresser or table either in the bedroom or the room next to it and left the house and got into the car, which was in the driveway and drove off with it.  He described McGrath's car as being a smaller model car, dark in color.
>
> When asked about any type of flammable [sic] fluid or liquid being put on Mr. McGrath and then setting it on fire he stated that he didn't remember anything

about that.  He was asked about why he broke into Mr. McGrath's house and why
did he tie him up he stated he didn't know why he broke into the house, he didn't
want him to contact the police when he left the house with his car. . . .

When questioned about his intent in the McGrath incident he stated he
didn't know.  He stated he didn't intent [sic] to hurt anyone and that he didn't
know what he was doing.  He stated that he would do anything to keep from
[going] to the [electric] chair.

Lott v. Coyle, 261 F.3d 594, 620-21 (6th Cir. 2001).

When reviewing Lott's actual innocence claim on appeal from his first federal habeas

petition, the Sixth Circuit found Lott's confession to be significant.  Although it initially opined

that it was "troubled" that Lott was convicted based solely on circumstantial evidence, the Sixth

Circuit reasoned that if Lott's statement ultimately were found to be reliable, it would present the

Court with more direct evidence of Lott's guilt.  It held, "[a] more detailed review of the

circumstances than appears in this record may show that Lott's inculpatory statement, although

suppressed at trial, was voluntarily made and admits of no reason to doubt its reliability or

truthfulness."  Id. at 621.

Although Lott now attests that this statement was a complete fabrication, the Court

observes both that Lott first made such an assertion in 2002, during his clemency hearing and that

Lott presented no evidence at the hearing before this Court which supports that claim.  Thus, Lott

did not contest the veracity of this statement in any of his prior proceedings and has still yet to do

so in any meaningful way.

During a deposition taken during the second habeas proceeding, Lott denied he made any

statement regarding his involvement in the McGrath murder.  Instead, he maintained that Hughey

spoke to him about someone he knew by the name of Freddie Robinson and his brother.  (Doc.

No. 69, Exh. 2, at 18).  Although Lott conceded that he became emotional after being arraigned

38

on murder charges, he claims that he never even spoke to Hughey regarding the McGrath murder. Id. at 20.

The Court finds Lott's attack on Hughey's credibility unavailing. Not only is there no evidence in the record that Hughey had any reason to fabricate the confession, the confession itself undercuts any claim that it was fictionalized. First, the absence of reference to an outright admission regarding the arson is telling -- had Hughey invented Lott's words, he would likely have completed the story. Second, details provided in the statement are itself telling -- all being later corroborated by the murder investigation. Lott's confession comports with police testimony stating that the assailant broke in through a basement window, that McGrath was tied up with a telephone cord, and that the assailant left McGrath in the bedroom. Moreover, it substantiates both Coleman's testimony and McGrath's statement that Lott was driving McGrath's car. For these reasons, the Court credits Respondent's assertion that Lott, in fact, provided the above-described confession shortly after the murder.

### c. Conclusion

In reviewing all the evidence regarding Lott's actual innocence of McGrath's murder, the Court finds, for the reasons stated above, that he falls far short of establishing, as he must to prevail on a successor petition, that he can establish his actual innocence by clear and convincing evidence. Although McGrath's description of Lott's skin tone would tend to exculpate Lott, other evidence Lott maintains proves his actual innocence does not, in fact, do so. Upon further review, some of these materials, such as McGrath's assertion that he knew his assailant from his barbershop, tend to further implicate Lott. Given the circumstantial evidence presented at trial and Lott's confession, the Court finds that Lott fails to meet the standard set forth in

§ 2244(b)(2)(B)(ii).  Thus, pursuant to that statute, his successor petition must be dismissed.

## 2. <u>Schlup v. Delo</u>

Even if the Court were to disregard the heightened statutory standard of actual innocence, it would find that Lott could not establish his actual innocence pursuant to <u>Schlup</u>.  As discussed above, <u>Schlup</u> and <u>House</u> dictate that, to establish actual innocence, a habeas petitioner must demonstrate that it is "more likely than not, in light of the new evidence, no reasonable juror would find [the petitioner] guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt."  <u>House</u>, 126 S.Ct. at 2077.

As stated above, most of the new evidence Lott presents in support of his innocence does not prove it.  The Court found that only the McGrath skin tone description would support his innocence.  All other evidence Lott presented was either neutral, neither establishing nor undercutting his guilt, or tended to inculpate him.  This new evidence coupled with the evidence presented at trial and Lott's confession do not establish that it is more likely than not that any reasonable juror, hearing all this evidence, would have reasonable doubt about Lott's guilt.  Lott cannot establish his actual innocence pursuant to <u>Schlup</u>.  Accordingly, the Court must also find that Lott has failed to establish a "gateway" by which to excuse the procedural default of his <u>Brady</u> claims.  Thus, Lott is not entitled to a merit review of them.

## V. <u>Brady</u> Claims

### A. Standard of Review

Assuming Lott could surmount the statutory standard and procedural default hurdles, the Court now examines the merits of Lott's <u>Brady</u> claims pursuant to the standard set forth in the

40

AEDPA.  Thus, to succeed on this claim, Lott must demonstrate, pursuant to 28 U.S.C. § 2254(d), that the state court decision:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This legal standard establishes a multi-faceted analysis involving a consideration of both the state court's statement and/or application of federal law and its finding of facts.

With respect to Section 2254(d)(1), "clearly established federal law" refers to the holdings, as opposed to dicta, of the United States Supreme Court's decisions as of the time of the relevant state-court decision.  Williams v. Taylor, 529 U.S. 362, 412 (2000); Barnes v. Elo, 231 F.3d 1025, 1028 (6th Cir. 2000).[19]  The "contrary to" and "unreasonable application" clauses of the Section 2254(d)(1) are independent tests and must be analyzed separately.  Williams, 529 U.S. at 412-13; Hill, 337 F.3d at 711.   A state court decision is "contrary to" federal law only "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13.

Even if the state court identifies the "correct governing legal principle," a federal habeas

---

[19]    Although only Supreme Court case law is relevant under the AEDPA in examining what federal law is "clearly established," Circuit Courts of Appeals' decisions "may be informative to the extent [they] have already reviewed and interpreted the relevant Supreme Court case law to determine whether a legal principle or right had been clearly established by the Supreme Court."   Hill v. Hofbauer, 337 F.3d 706, 716 (6th Cir. 2003).

court may still grant the petition if the state court makes an "unreasonable application" of "that principle to the facts of the particular state prisoner's case." Williams, 529 U.S. at 413.  A state-court decision also involves an unreasonable application if it unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.  Id. at 407; Hill, 337 F.3d at 711.   In order for a state court's application of clearly established federal law to be unreasonable, the state court's decision must be more than incorrect or erroneous, rather it must be objectively unreasonable.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003); Williams, 529 U.S. at 411; Simpson v.  Jones, 238 F.3d 399, 405 (6th Cir. 2000).  The reasonableness of the application of a particular legal principle depends in part on the specificity of the relevant rule.  Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  While the application of specific rules may be plainly correct or incorrect, courts may have more leeway in reasonably applying more general rules in the context of a particular case.  Id.

As to the "unreasonable determination of the facts" clause in Section 2254(d)(2), the Supreme Court applied that section of 2254(d)(2) in Wiggins v. Smith, 539 U.S. 510 (2003).  In that case, the Court noted that a "clear factual error" such as making factual findings regarding the contents of social service records contrary to "clear and convincing evidence" presented by the defendant constitutes an "unreasonable determination of the facts in light of the evidence presented." Id. at 528-29.  In other words, a state court's determination of facts is unreasonable if its findings conflict with clear and convincing evidence to the contrary.  This analysis mirrors the "presumption of correctness" afforded factual determinations made by a state court which can only be overcome by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); see also Mitchell v.

42

Mason, 325 F.3d 732, 737-38 (6th Cir. 2003); Clark v. O'Dea, 257 F.3d 498, 506 (6th Cir.

2001)("regardless of whether we would reach a different conclusion were we reviewing the case

de novo, the findings of the state court must be upheld unless there is clear and convincing

evidence to the contrary").  This presumption only applies to basic, primary facts, and not to

mixed questions of law and fact.  Mitchell, 325 F.3d at 737-38.

### B. Substantive Analysis

In his successive post-conviction petition, Lott alleged that the State failed to disclose

information identifying someone other than him as McGrath's killer and evidence that McGrath

owned an oil lamp.  On appeal from the denial of post-conviction relief, the Eighth District Court

of Appeals correctly identified Brady v. Maryland, 373 U.S. 83 (1963) and United States v.

Bagley, 473 U.S. 667 (1985), as the controlling United States Supreme Court precedent on this

issue.  It then reviewed both of Lott's claims pursuant to this standard.[20]

Regarding the McGrath identification issue, the Eighth District held, following this

Court's prior conclusion, that the discrepancy between McGrath's description and Lott's

appearance was not substantial.  It held:

> McGrath described his assailant as six feet tall, that is, two inches taller than
> appellant. McGrath also identified his attacker as light complected with long hair,
> whereas appellant has a medium complexion and, at the time of his arrest, had
> short hair. We note, however, that a two-inch difference in height is not
> significant. Nor do we find the difference in complexion tones exculpatory in light
> of one witness' testimony that appellant was found with liquid make-up upon
> arrest and the witness believed he used the make-up to lighten his skin tone.
> Finally, appellant could have had his hair cut after the attack on Mr. McGrath.

---

[20]  While the Eighth District held that Lott had procedurally defaulted his claims on
grounds of res judicata, it alternatively ruled on the merits.  This alternative
holding does not lift the procedural bar.  Seymour v. Walker, 224 F.3d 542, 557
(6th Cir. 2000)

Appellant's attorney, moreover, chose to keep the jury [sic] from hearing the victim's description of his attacker. Given the minimal differences between the victim's physical description of his assailant and appellant's physical traits, we do not conclude that the information would have necessarily been favorable to appellant.  We agree with the assessment of the Federal District Court that found that the description is not so contrary to Lott's actual appearance that it would have made a material difference in the outcome of Lott's trial, given the other strong circumstantial evidence of guilt.

State v. Lott, No. 79790, 79791, 79792, 2002 WL 1265579, at *3-4 (Ohio Ct. App. May 30, 2002).

While this Court found, as stated above, that McGrath's description of Lott's skin tone was sufficiently different from Lott's actual skin tone to lend support to his actual innocence claim, and that there was no affirmative evidence that Lott used skin-lightening makeup to alter his appearance, the Court must defer to the Eighth District's factual findings unless it concludes that they are "unreasonable."   As stated above, to be unreasonable, the state court's decision must be more than incorrect or erroneous.  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003); Williams, 529 U.S. at 411; Simpson v. Jones, 238 F.3d 399, 405 (6th Cir. 2000).

The Court finds that, based on the review of the evidence it performed above, the Eighth District Court of Appeals' decision was not an unreasonable one.  Although this Court found no direct evidence in the record that Lott actually used skin-lightening makeup, the Court also found that McGrath's medical condition at the time he provided the identification statement left doubts about its accuracy.  Thus, the Eighth District's ultimate conclusion that the State's withholding of McGrath's description of his assailant was immaterial to the outcome of Lott's trial is not an

44

unreasonable one.  Lott's first sub-claim is not well-taken.[21]

Similarly, the Eighth District Court of Appeals also found Lott's claim that the prosecutor withheld information regarding the oil lamp was not material to the panel's verdict.  It observed that Lott was not charged with prior calculation and design.  Thus, the Eighth District held:

> What is material is the fact that oil from the lamp was poured on the victim in order to set him on fire. This court fails to see how the crime for which appellant was convicted has anything to do with who owned the lamp containing the oil used to ignite the victim. It was an ugly act, no matter whether he brought the lamp with him or merely made use of a lamp already there.

State v. Lott, 2002 WL 1265579, at *4.

The Court finds this conclusion to be reasonable and compatible with what this Court held above.   The State did not need to prove prior calculation and design in order to convict Lott of aggravated murder.  Thus, it is irrelevant whether Lott brought the lamp oil with him when he entered McGrath's home or if he used it upon finding it there.  This claim has no merit.


## VI. CONCLUSION

For the foregoing reasons, the Court finds that Lott's second or successive habeas petition must be dismissed pursuant to 28 U.S.C. § 2244(b)(4), because he cannot establish the

---

[21]  While this Court need not address this issue pursuant to the standard set forth in § 2244(d), it notes that, had Lott's counsel attempted to introduce McGrath's statement during trial they may have encountered problems admitting it.  Because McGrath was unavailable, the statement may have constituted hearsay.  Although Mr. Kersey argued during cross-examination during the evidentiary hearing that the panel may have permitted the use of the statements under the dying declaration exception to the hearsay rule, (Doc. No. 85, at 40), that argument is speculative.  Indeed, it is somewhat ironic that Lott would now rely on such speculation since, it would seem, that the closer McGrath was to expiring, the less likely it is that he would have been cogent enough to provide any meaningful information.

45

requirements for adjudication  set forth in 28 U.S.C. § 2244(b)(2)(B).  Alternatively, the Court finds Lott cannot excuse the procedural default of the claims Lott raises pursuant to <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), because he cannot establish under the standard set forth in <u>Schlup v. Delo</u>, 513 U.S. 298, 327-28 (1995), and its progeny that he is actually innocent.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that an appeal in forma pauperis would not be frivolous and can be taken in good faith.

The Court concludes, moreover, that, given the complexities involved in the analysis set forth in this order, and obvious differences of opinion by reasonable jurists already reflected in the litigation history of this matter, a Certificate of Appealability is appropriate as to all issues raised herein.


**IT IS SO ORDERED**


<u> **s/Kathleen M. O'Malley**</u>
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**


**DATED:  September 28, 2007**

46